We'll next move to case number three, appeal number 18-2753, Martin Chaidez v. Ford Motor Company. First, we'll hear from Ms. Brown. I've agreed to give three minutes of my time to EEOC counsel, and I'd like to reserve three to five minutes for rebuttal. Very good. We have you down for five minutes of rebuttal as well. Thank you. Very good. You may proceed. May it please the court, counsel, my name is Christy Brown. I'm from the Patterson Law Firm, and I represent the plaintiff's appellants in this case. I want to talk first about the adequacy of the allegations of the complaint in this case. There was a case, Bennett v. Schmidt, at 153 Fed Third 516 from the Seventh Circuit that's cited in the Scott case in our brief. And in that case, Judge Posner writing for the court said, because racial discrimination in employment is a claim upon which relief may be granted, this complaint could not be dismissed under Rule 12b-6. I was turned down for a job because of my race is all a complaint has to say. Because a claim of disparate treatment requires proof of intentional discrimination, a plaintiff might want to allege intent, although this is implied by a claim of racial discrimination. A general allegation of intent is all that is required. A complaint does not fail to state a claim merely because it does not set forth a complete and convincing picture of the alleged wrongdoing. Ford points out two things about our complaint that it says are deficient. The first is the allegations of Ford's intent with regard to the disparate treatment claim. Going back to that opinion of the Seventh Circuit, we've alleged racial discrimination in hiring, and therefore intent is inferred in that treatment. But further, we allege specifically that plaintiffs were denied employment based on Ford's intentional discrimination in paragraph 44. Ford's objections are connecting Ford's intent to either Mr. Millender or the Illinois Employment Office and their actions. The hiring in this case, as we've alleged, was conducted by the Human Rights Office and the Labor Relations Offices of Ford. The hiring wasn't done by the Illinois Employment Office. It was done by Ford. We've also alleged that Millender and others used their positions at Ford in these offices, the Human Resources Offices and the Labor Relations Office, to create a predominantly black workforce at Ford in Harvey, Illinois. Mr. Brown, can I focus you in on this cheat case and the reasonable relation between the EEOC charges and the complaint? Sure. Because the fulcrum of where we seem to be is whether or not that requirement is satisfied. The EEOC charge can be read as Hispanics or Latinos not allowed into the application process. And the complaint itself saying Hispanics or Latinos allowed in, but automatically fail and prevent from advancing. Part of our task here is to determine whether or not those satisfy that reasonable relation. What is your response to Judge Norgo's conclusion that it was not reasonably related? Your Honor, with all due respect, I think you have them flipped. Reverse it. I apologize. The charges in this case, charges are only required to allege certain things under the regulations. They have to identify the claimant. They have to identify the respondent. And they have to have a clear and concise statement of facts, including dates, constituting an unlawful employment practice. The claimants in this case, other than one claimant, Stephanie, the claimants said, I applied for a job through the Illinois Employment Office to be a line worker at Ford and Harvey. I either never was contacted again or I received a turn down. They don't say they ever went for testing. They clearly allege in those complaints, in those charges, that they were denied employment before they ever reached testing. Now there is an allegation in that charge as well that says that Hispanics were allowed to test, but then were not able to get those jobs on the line. But for six out of the seven plaintiffs, they didn't test. So that allegation, although it's in there, isn't directly related to their claim for relief. They're claiming, I was never sent for testing. It was done on a discriminatory basis. So I've alleged a charge of discrimination. And what we have is a level of abstraction, right? And we're trying to get down to determine how particular it needs to be. If it's discrimination alleged in the EEOC charge and discrimination alleged in the complaint, just that word discrimination, that's very vague. If we get down to the particulars, though, for notice purposes and to determine exhaustion of administrative remedies, we have to see that reasonable relation according to Cheek. If there's factual distinctions, maybe same persons but different conduct, is Judge Norgal correct in that instance? I don't think so, Your Honor, because I think both the complaint and the charge is alleged both types of conduct. And certainly we can bring a charge or a complaint that includes more than one type of discriminatory conduct. So my point is, with the charges, clearly those six individuals cannot be alleged that they were discriminated against after they took the test because they never got to take the test. And that's clear from them saying, I applied, I was turned down, or I never heard from them again. Never got past that first stage. We've elaborated on that in the complaint with additional allegations, but it's in the charges. The cases where the courts have found that the charge isn't sufficient to support the complaint are cases where somebody's added a different type of discrimination. So, for example, someone claims they were discriminated against based on gender, and then they add a sexual harassment or retaliation claim in the complaint. Or cases where different dates and times and individuals involved in the discrimination are alleged. So, for example, in some of the cases, someone has alleged in their charge, I was passed over for promotion on this date by this individual supervisor. Then a complaint is filed that says, I was also passed over for promotion on six other dates by different supervisors. Those are not substantially related according to the decisions. In this case, we're talking about the same people. We're talking about the same type of discrimination. We're talking about the same events. The same employer, the same office, the same geographical location. Everything about the two is the same. And we were also talking about two different events. Discrimination before testing and discrimination after testing. And each of the charges, and certainly the charges collectively, make both of those claims. And the complaint makes both of those claims. Would you like to reserve the rest for rebuttal? Yes, Your Honor. Okay, thank you. Thank you, Ms. Brown. We'll next hear from Mr. Tucker of the amicus. Good morning, Your Honor. I'm Jim Tucker with the EEOC. I'd like to follow up a little bit on the Plaintiff's Counsel's response to your question, Your Honor, about Cheek and how to reconcile the standard that applies regarding the like or reasonably related standard in determining what was alleged in the charges and how that correlates to what can be properly presented in the complaint. I think what's important to keep in mind when looking at that standard is that the court has recognized that when you're assessing the content of the charge, you need to take a look at that through a liberal view to the charge pleading. There are very limited requirements that are required for the content of a charge, much less and a much lower standard than is required for the contents of a complaint. We've identified that the Supreme Court recognized that in shallow oil, and this court itself has recognized that. There's a significant distinction between the two. Looking at the charges liberally and also when looking on a motion to dismiss at the complaint, reading it in a light most favorable to the plaintiff and interpreting any ambiguities in favor of the plaintiffs. Now, applying those standards to the correct reasonable relations standard that fits for like and reasonably related, and again, to be clear what that standard is, is that there has to be a reasonable relationship between the allegations in the charges and the allegations in the complaint. Not identity, but a reasonable relationship. If there was the type of level of parity and equality that was required by the district court here, we wouldn't have a like or related standard. We would have the same thing standard, which is specifically what this exception to specific exhaustion is trying to get around. Not only is there a reasonable relationship, but again, it has to be reasonably anticipated that the subject matter of the complaint would arise or come out of an investigation by the EEOC. That's what has to be satisfied. Here, as counsel just identified, I think it's impossible for a reasonable party to come to a contrary conclusion. We have the same seven plaintiffs as in the charge. We have the same Harvey, Illinois hiring location. We have the same job, the line worker position at Ford. We have the same allegation of discrimination against Hispanic qualified applicants. We have the same allegations throughout all of the charges and the complaint that they were engaged in systemic disparate treatment and pattern of practice, or excuse me, disparate impact discrimination. And all of the allegations, if you look at them, again, in the correct standard, in the light most favorable to the plaintiffs, each of these are essentially parallels. In the charges, the individual specifically identified that as a general matter, Hispanics are allowed to engage in pre-employment testing. And to be clear, the district court hung up pretty much on this one specific fact. But that's not the claim. The claim is that pre-employment testing was discriminatory. The claim is hiring by Ford at this facility was discriminatory. And one of the ways in which it was discriminatory was in the pre-employment testing  Now, for the district court to say that all, as it did in its decision, that all of the plaintiffs alleged that they were able to engage in pre-employment testing is simply factually incorrect. The allegations in the charges specifically state only one person alleged that she had, I'm sorry, Your Honor, if I may continue in this last section, there's a lot to say. I apologize. The point being, all of them alleged that there were alternative methods by which Ford may have been discriminated against both in the charges themselves. I encourage the court to review the charges again. And also in the specific complaint, paragraph 33 in particular, which deals with the four specific alternatives by which Ford may have discriminated against and which the district court misinterpreted by including an and where there was no and and omitting the larger qualifier at the end of the paragraph stating that they may have been discriminated against in other ways beyond pre-employment testing. I want to ask you a little bit further. Just specifically, you mentioned paragraph 33. In fact, on page 12 of your brief, paragraph 33 of the complaint lists three methods of alleged discrimination as alternatives, not as a description of what happened to every single Hispanic applicant. There is some confusion when I'm looking at this about whether they sufficiently said they could take the test. Well, let me read paragraph 33 to you, Your Honor. First of all, paragraph 33 states specifically, alternatively the lack of Hispanic and or Latino line workers is due to the hiring scheme put in place by Alan Millender, the United Oil Workers Plant Chairman at the plant. As part of this scheme, the Harvey Illinois Unemployment Office at the direction of and in concert with Millender either does not accept or destroys applications or contact information forms from Hispanic and or Latino applicants. Semicolon. Does not allow the applicants to take pre-employment testing, comma, or otherwise interferes with the applications of Hispanic and or Latino applicants. Now, six of the seven individuals that are the named plaintiffs in this case have not alleged that they were allowed to take pre-employment testing. They have not alleged what? They have not alleged that they were allowed to engage in pre-employment testing by Ford. So they alleged. I mean, it's implied that they didn't. It's not only implied they didn't, but they specifically said that they filed their applications and then they never heard back from Ford again. So that means they never had a chance to take the test. Six of the seven, but one did. And that's some of the confusion here is that the individuals had varying differences with how the application process played out with them individually. But their claim is still the same. The title seven was violated in regard to the hiring of Hispanics at the facility. And that's consistent with both the charges and the complaint. The charges also include that final qualifier read from paragraph 33. We didn't mention or emphasize it in our brief, but it is also in all the charges. I believe to help the Court, it is at paragraph. Same paragraph? No. I'm sorry, Your Honor. I'm looking at the specific charges. I'm looking at the charge of Kevin Zeninga, and this is at page ID number 70. And he has alleged at paragraph 10, in the event that Hispanic applicants do pass basic skills testing, their application process is stalled in some other way to preclude employment at Ford. So they've gone out of their way, Your Honor, to make that point that there are other ways besides pre-employment testing. Well, I think it's important that you filed a separate brief here. That's all. Well, thank you. You've pointed out some things that raised questions for me. We're trying to help the Court, Your Honor. Thank you, Mr. Tucker. Thank you. Mr. Scalia. Good morning. May it please the Court, Eugene Scalia, representing Ford Motor Company. In the charges that plaintiffs filed with the EEOC, they very specifically and repeatedly indicated that they were implicating in employment tests administered by Ford and steps that occurred afterward in the application process. In each of these charges, they talked about how, quote, are allowed to take pre-employment tests, first. Second, they stated the pass rate. They say they generally don't pass. They then made a third reference to the test, saying even supposing they pass, you just heard the EEOC refer to this paragraph, even supposing they pass the test, Ford finds some other way to supposedly stall their employment. And then a fourth time, they say, by contrast, non-Hispanics get hired without taking the test. And so they repeatedly and purposefully sought to focus the EEOC and Ford's attention on this test. And they said something else that I would note. They said, and this, for example, is in paragraph 11 of the number of charges, they referred to Hispanic applicants, quote, that are considered by Ford, end quote. This is the charge that was brought to the EEOC. This is what Ford saw. Ford was entitled to notice. You read this, and what you read is there's a problem supposedly with the test administered by Ford and at Ford afterward. And by the way, it's true. One person said specifically she took the test, but given the allegation that by agreement they take the test, given the reference to the test results, given the reference to what happens after the test, given the reference to non-Hispanics not taking the test, a reasonable person reading this wouldn't conclude that the other six were complaining that they never took the test. So that was what was before the EEOC. And then they came to court and told a radically and disturbing story about a supposed conspiracy that actually didn't involve the test results or something after the test, but all supposedly took place at this unemployment office. Ford was entitled to notice. Now, this supposed conspiracy involving an hourly employee who's an elected union official and supposed people at the unemployment agency, that's serious stuff. It's a total fiction, total tall tale, as reflected in the fact that one of the few actual facts they cite in their complaint is this exhibit E to their complaint, which is a patently falsified document. That document supposedly was on a Friday, March, I believe March 25th, a date that did not exist that year because that was a Wednesday, not a Friday. We called that out to them. They agreed to withdraw it, but never did. They've continued to rely on it. They cite it three different times in their complaint, this falsified document, about a supposed conspiracy back at the plant. Let me talk a little bit more about that plant. I'm sorry, the unemployment office. Because it's important to bear in mind that the allegations about the test and post-test activity, that's once it's come to Ford and it's gotten test results, it made the test. What happens at the unemployment office is not Ford. I believe both counsel who appeared before you before pointed to paragraph 33 of the complaint. But if you read paragraph 33 of the complaint, it's about the unemployment office. That's not a place where the test is administered. You have to get through that office to take the test. What they're saying in paragraph 33 is the office is what prevents you from moving forward. They say that again in paragraph 40. They say that again in paragraph 41. Each of those paragraphs says that Millender, this is the person who's the subject of the falsified email, was supposedly working with the unemployment office to stop these things. Just a brief side note on Twombly. There are no significant supporting facts about that supposed conspiracy, even though this court has held there's a heightened pleading obligation. But then, so then I take you to paragraph 42. They say in paragraph 42, even supposing that these forms make their way to Ford, what happens? Ford finds a way to prevent them from being forwarded for testing. So most of the complaint is about what happens at the unemployment office, which doesn't administer the test, and it means it happened before things left the building and had the opportunity for testing. And when they finally get to making some allegation about Ford Motor Company itself, what they're saying there is that Ford didn't forward the people for testing. So again, having come to the EEOC and said, this is about the test, and it has a disparate impact, and even if they pass the test, something happens, they told a completely different story in federal court. And certainly it doesn't need to be identical. It doesn't need to be the same. But there does need to be a reasonable relationship. Any contradiction, such a conflict as this, is not reasonable. And a good example is the Miller case. The Miller case by this court involved alleged age discrimination. It was the same actors that were alleged to have discriminated. It was the same conduct, age discrimination. But before the EEOC, the plaintiff said, the problem is the collective bargaining agreement was unfairly applied to me. And then in federal court, the plaintiff said, well, the collective bargaining agreement itself violates the Age Discrimination in Employment Act. And this court said unanimously, sorry, you brought a different allegation before the EEOC than you're now bringing here in court because you said before the problem was application of the agreement. Now you're saying the problem is on the face of agreement. And the court said that's not enough. The closer cases have tended to be ones where there was some passing reference to sexual harassment. And the question was, does that support a hostile work environment claim? There is absolutely no case, if not cited one, there's not one. In this circuit, or any circuit that I'm aware of, where plaintiff was permitted to plead in court something inconsistent with what they pleaded before the EEOC. And again, I want to emphasize the importance of notice to Ford and an opportunity to conciliate as well. It's not just about what the EEOC might have heard. It's Ford's ability, when a charge has been filed, the Cheeky case and others emphasize this. Ford's ability to know what's been charged against it so he can decide how to handle this. If I'm Ford, and I get this charge saying Hispanics are allowed to take the test, they largely don't pass, even when they pass they're discriminated against, and non-Hispanics don't have to take the test. I consider one set of factors, including, as Ford noted in the position statement, which plaintiffs attached to their opposition before the district court, Ford knew the test was professionally validated. It was able to go look at its test results. It could take a look at that charge and say, our test is fine. This charge doesn't concern us. But that didn't get to Ford, is that what you're saying? It didn't go that far. Well, it went no farther than that. That is, I think, how I would say it, because the charge before the EEOC was about a supposed problem with people passing the test, and Ford was able to say, our test is fine. All of a sudden, though, they're being sued in federal court about this wholly fanciful, unsupported conspiracy involving the union president, which they weren't told anything about. If they'd been told that, you would view a case like that differently. And so it's not enough that they allege discrimination in hiring based on national origin, as has been suggested to you. The Miller case shows that. That was supposed age discrimination. Well, what is it with that allegation, which, of course, you also would say that's pretty troubling if that's the case, that Millender is doing this, and no Hispanics are getting hired, and he's black, and he wants to stay powerful in the union, and therefore, only black people are getting hired. And you're saying, well, that's brand new, I guess. Exactly, Your Honor. And so what's next? Well, with all respect, defer to district court, because they brought a completely different story about this supposed conspiracy into federal district court, which they didn't charge. They said before that people got to the test stage. Now they're saying that they were barred from doing it, something they never alleged before, that there was an attempt to bar them from getting that. And having failed to bring those allegations to the EEOC, they can't now bring them as they do in court. And as we're trying to flesh out the cheat standard, reasonably related, sufficiently like, I think the EEOC also uses on page 11 of its brief phrases like functionally identical or essentially identical. Sometimes that boils down to same conduct, same persons. Your argument is not only is the conduct different, but in effect, the persons are different, because what Ford was on notice of was something having to do with the unemployment office versus Ford itself. I think that captures the judgment. Let me just follow up with regard to that. Is Ford's process here that they outsource to AON the idea of doing this pretesting, and then the applicants get to Ford through AON? Largely. These contact forms go to Ford, which puts the list together, which it then sends to AON. And the forms just say if an opportunity arises, you may be contacted. It doesn't say there's a job opening, come and get it. But if I could come to the cheat standard, it says at minimum must be same conduct, same persons. It doesn't say that's enough. Here we don't have the same conduct. In the charge, we had this flawed test and afterward. In the case, we've got flawed pretest. So we don't have the same conduct, as I think you were suggesting with your question. And as you say, not the same persons either, because now supposedly it's people at the unemployment office destroying material. So I think when you apply the standard articulated in cheat, but again the Miller case is in a sense very close to point, because that was actually the same people. It was the same complaint, age discrimination, but it failed because they first said the collective bargaining agreement was discriminatorily applied. And then they attacked the collective bargaining agreement itself. The inconsistency here between are allowed by agreement to take the test, and then claiming there's a scheme to prevent them from taking the test. They said by agreement they take the test. Then they say conspiracy not to take the test. If I could talk, so I would summarize it this way. Reasonable relationship means that at minimum there can't be inconsistent factual allegations. You cannot contradict your charge. And again, it has to be the same conduct. And the conduct charged to the EEOC was different in kind from what was put in the complaint. Briefly on Twombly, setting aside the failure to exhaust remedies, this complaint is a textbook case of speculative assertions and legal conclusions that are unsupported by underlying facts. They cite no facts to establish that there are people at this unemployment office whose job it is to help people find jobs, that they somehow have decided to conspire and behave in this manner. They cite no facts supporting that very serious allegation. This court has said in the McCauley case, in the McReynolds case, that when you allege a more complex case, such as a conspiracy, you have a heightened burden to plead facts. They fall short. You heard at the beginning of plaintiff's argument, cite to a case. It's a pre-Twombly case. In their brief, they cite the Conley-Gibson standard, which the Supreme Court overruled. That's what they're citing when they cite that old Seventh Circuit case, which they never mention in their briefs. When you apply Twombly and Iqbal, as applied by this court, a separate reason to affirm is that they simply did not put forward facts that were adequate under Rule 8 to substantiate their discrimination allegations. They made a series of confusing, unsupported assertions and legal conclusions without facts, and one of the few facts they gave you was that falsified document, which they cite three times in their brief. I'm sorry, in the complaint itself. Two last points. First, they have suggested, and they have done this time and again, that six of the seven plaintiffs said they didn't take the test. That is not true. What all of the plaintiffs said was that Hispanics, by agreement, are allowed to take the test, and one of them specifically said she took the test. None of them said, I was not allowed to take the test before the EEOC. And then finally, with their complaint that they should be given leave to amend, it's too late to raise that in this court. They never properly sought leave to amend in the district court. They included a single sentence saying, we'd like leave to amend when they opposed Ford's motion, but they never said what the amendment would be. They never explained how they would fix anything. And then when the court ruled against them, they filed a Rule 59, Rule 60 motion, but they did not seek to amend their complaint with that motion, and they rely on two cases, the Roller case and the Foster case. In both of those, what the Rule 59, Rule 60 motion was, was a motion for leave to amend the complaint with a proposed complaint. They took a different course. They decided not to try to amend, and therefore it's too late to raise that now. Thank you, Mr. Scalia. Thank you. Ms. Brown, rebuttal. I'd like to start with just going to the charges. The charges of the individuals who did not go to testing. I filled out a pre-application questionnaire. I am qualified for the position of line worker. I never received any further information about potential employment at Ford from Ford or the Harvey Unemployment Office. Further down, Mr. Millender's agreement with the Harvey Unemployment Office has ensured a gross under-representation of Hispanic workers at Ford. The only way that's possible is if these individuals did not go for testing, if they were somehow excluded before they got to the testing phase. Paragraph 15, Ford and its agent Millender have created a process to either intentionally discriminate against complainants on the basis of race or have created a hiring process that has a disparate impact on Hispanic applicants. And which charge is this? This is the charge of Jessica Gallon. If you happen to have a record site. It's in our appendix at A20 and A21 here. Thank you. In the last paragraph, complainant is aware of several other non-Hispanic individuals who have been hired through the Harvey Unemployment Office. So even though it's accurate that they also discussed the testing situation, it's very clear, and Ford could not have, there's no way that Ford could read this charge and say to themselves, the only issue here is the testing. This is someone who clearly never went for testing, and it's an allegation that discrimination is taking place in connection with the Illinois Unemployment Office before these individuals get tested. And what we'll have to struggle with is what the nature of that discrimination is, whether it changed between the charge and the complaint, or whether it's the same. It's that level of abstraction we talked about before. I understand, Your Honor, and I think if you take a look at the exhibit that I prepared and attached to our reply brief, it will help. I've set out what are the pre-testing acts of discrimination alleged in the complaint and in the charges, and what are the post-testing acts of discrimination alleged in the complaint and in the charges. The allegations are identical in some situations, substantially similar in others. The only thing that's added is detail. So, for example, the complaint alleges several months later plaintiffs were informed that they were not hired or they never received any response. Same exact allegation from the charge. What's added is people at Ford did not send plaintiffs for testing. That's clear from the charge because these individuals say, I never made it out of the Illinois Unemployment Office. But I think if you take a look at that exhibit, I've outlined every allegation that relates to an act of discrimination. In this case, it appears in both the complaint and the charges. So there is certainly no inconsistency between the two documents. Well, it's just not an inconsistency where they said you didn't allege it and for some reason you didn't specifically mention no testing or weren't allowed to take the test or didn't have an opportunity to take the test or something. And I think that's obvious from I never received any further information after I filled out a pre-application questionnaire. And then if you go further down in the charge when it says the agreement between Mr. Millender and the Harvey Unemployment Office has ensured a gross under-representation of Hispanic workers. You can't – these are individuals who didn't go to testing. The discrimination occurred before that. They never made it. Their cards never made it to Ford. They never made it to Aon for testing. So at the outset, you're saying that there was a conspiracy between Millender and the employment agency? I think what we've alleged is that Mr. Millender controlled that process and he controlled that process as an employee of Ford. Now, obviously, we haven't been given an opportunity to take discovery in this case, and discovery will tell us exactly what the details of that control were. I would like to just quickly address the issue on the motion to amend. Judge Norville, in this case, at the same time that he entered the order dismissing our complaint, entered a judgment. We did file a post-judgment motion, but in our view, when we asked him to reconsider, we asked him to reverse his earlier judgment. Had he done that, we would have had an opportunity to amend the complaint. We did reference in the end of our brief and in response to the motion to dismiss, if this complaint's inadequate, we'd like an opportunity to amend. Typically, no one gives the judge an amendment before you have a ruling on the motion to dismiss. That would be a waste of time. But in this case, Judge Norville took the very unusual process in a first-round complaint of saying the complaint is dismissed, judgment is entered for the defendant. The judge didn't get to the adequacy of the complaint. He ruled solely on the exhaustion principle. So I think we haven't been given that opportunity. Thank you, Ms. Brown. Thank you, Mr. Tucker. Thank you, Mr. Scalia. The case will be taken under advisement.